UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| V. | § § | NO. W-20-CR-097-ADA |
| CECILY ANN AGUILAR | § § § | |

**MOTION TO SUPPRESS**

COMES NOW Defendant CECILY ANN AGUILAR, by and through counsel, and moves to suppress evidence obtained as a result of her illegal seizure on June 30, 2020, and her statements made during custodial interrogation without being advised of her *Miranda* rights. Ms. Aguilar requests an evidentiary hearing to establish the facts at issue in this Motion and resolve any disputed facts.

**I.     RELEVANT PROCEDURAL & FACTUAL BACKGROUND**

Ms. Aguilar is charged with conspiracy to tamper with the body of V.G. and tampering with the body and hiding it, in violation of 18 U.S.C. §§ 1512(c)(1) and (k).[1] (ECF No. 17.) V.G. was a Fort Hood soldier who was reported missing in April 2020. (ECF No. 1 at 2.) Officers interviewed Ms. Aguilar on multiple occasions during the investigation because they believed her boyfriend, Aaron Robinson, was one of the last people to have seen V.G. (ECF No. 1 at 2.) During an interview on June 19, 2020, Ms. Aguilar told officers she was with Robinson the entire night in question, April 22, 2020. (ECF No. 1 at 3.) Officers asked why Robinson's phone records show

---

[1] Ms. Aguilar sets out the facts as alleged in the criminal complaint affidavit and discovery but does not stipulate to their accuracy.

him calling Ms. Aguilar many times that night, and she responded that he only called to help her find her phone. (ECF No. 1 at 3.) This conflicted with the phone records showing the calls lasted longer than one minute. (ECF No. 1 at 3.)

Investigators pursued other leads and, on June 21, 2020, discovered what appeared to be the burned remains of a tough box near an area where Robinson's cell phone had pinged on April 22. (ECF No. 1 at 4.) Human remains were found in a nearby area on June 30, 2020. (ECF No. 1 at 4.)

Also on June 30, officers spoke with Ms. Aguilar off-post at the Sun Mart where she worked. Officers who were surveilling her saw her get into a Dodge Caravan and followed it onto Fort Hood. The officers then activated red and blue emergency lights and stopped the Caravan. They detained Ms. Aguilar and the driver of the Caravan. Ms. Aguilar said she was not allowed to be on Fort Hood but that she was looking for a vehicle her estranged husband left for her. Ms. Aguilar was texting during the encounter and was told to stop. When she did not stop texting, an officer took her phone away. The officers let the Caravan driver go and told Ms. Aguilar she was not under arrest and was free to leave. They also asked if she would come with them to the U.S. Army Criminal Investigation Command ("USACID") Office on Fort Hood to be interviewed, and she agreed. Officers drove Ms. Aguilar to the USACID Office. Ms. Aguilar was not handcuffed during the encounter, but her phone was not returned to her.

At the USACID Office, the equivalent of a Fort Hood police station, the officers took Ms. Aguilar's other property from her and led her to an interrogation room. She was constantly surveilled by at least two apparently armed officers, one of whom was always placed between her and the door. When Texas Ranger Travis Dendy entered the interrogation room, he shut the door

behind him. The interrogation, which began at approximately 8:30 p.m. and lasted until nearly 1:00 a.m., was recorded.

The officers did not read Ms. Aguilar her *Miranda* rights at the beginning of the interrogation. They did not tell her anything she said could be held against her in court. They did not say she had the right to an attorney during questioning. And they did not ask if she was willing to waive those rights.

Ranger Dendy told Ms. Aguilar that she was not under arrest. DVD 14:05. Then he established that Ms. Aguilar had not been completely truthful in her prior interviews, and he reminded her that lying to a federal officer is a federal crime. DVD 14:45. He also told her that she did not have to talk to him if she did not want to. DVD 15:04. He asked if she wanted to talk to him, and she responded, "Might as well." DVD 15:08.

Ms. Aguilar then explained that she had lied about Robinson and her not leaving the house on the night of April 22. DVD 15:30-16:10. She said they had actually gone for a long drive, as that was one of her coping mechanisms to deal with her mental health issues. DVD 15:30-16:10. After she described the events of April 22 in detail, Ranger Dendy asked, "And that's the story you're going to stick with?" DVD 20:40. He followed up by asking Ms. Aguilar if she was willing to die for Robinson, to which she responded, "Sure." DVD 20:58. Then if she was willing to go to jail for him, and she said, "No." DVD 21:04. Dendy said, "that's the route we're fixing to go down because I know that you're lying to me—again." DVD 21:17. Dendy explained they found a body where she and Robinson were at on April 22. DVD 21:19. Ms. Aguilar then told the officers that Robinson took her out to the woods and showed her V.G. dead, in a tough box, and made her help him dismember the body. DVD 33:15. Dendy stressed to Ms. Aguilar that her assistance now would "make the difference between you spending 40 years, 30 years, or 20 years in prison." DVD

41:50. He urged her to "think of anything and everything … to save yourself right now," such as finding every item, bone, text message, and picture. DVD 42:30.

Ms. Aguilar continued to answer officers' questions, assisted with several controlled calls to Robinson, and told the officers Robinson would try to escape and would shoot himself rather than be taken into custody. After three hours of interrogation and attempts to help officers locate Robinson, Trooper Dendy told Ms. Aguilar that she would not be going home tonight and that she was under arrest. DVD 3:03:30. At that point, Dendy explained her *Miranda* rights, and she continued assisting officers. DVD 3:04:25.

## II. ARGUMENTS AND AUTHORITIES

Ms. Aguilar challenges under the Fourth Amendment the fruits of her illegal seizure and under *Miranda*, her statements during the interrogation on June 30, 2020.

**A. Ms. Aguilar's Fourth Amendment rights were violated by the illegal seizure, which morphed into an arrest.**

Officers seized Ms. Aguilar when they turned on red and blue flashing lights and pulled over the Dodge Caravan in which she was a passenger. This seizure was not supported by a warrant or reasonable suspicion and violated Ms. Aguilar's Fourth Amendment rights.

The Fourth Amendment protects "[t]he right of the people … against unreasonable searches and seizures[.]" U.S. Const. amend. IV. When a defendant is seized without a warrant, the Government bears the burden of proving that the officers had a reasonable suspicion to stop the defendant. *United States v. Martinez*, 486 F.3d 855, 859-60 (5th Cir. 2007). Any evidence obtained from the illegal seizures and fruits therefrom should be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

Here, the detention of Ms. Aguilar was not justified in its inception. *See United States v. Stevens*, 487 F.3d 232, 244 (5th Cir. 2007) (describing *Terry v. Ohio*, 392 U.S. 1 (1968), analysis).

4

The officers did not have a warrant to arrest Ms. Aguilar when they seized her. Nor did the officers have "a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Martinez*, 486 F.3d at 861 (cleaned up).

The detention then morphed into an arrest. While "brief and minimally intrusive detention[s]" are permitted under *Terry*, such detentions can morph into a de facto arrest based on the circumstances of the detention, including the length. *United States v. Massi*, 761 F.3d 512, 523-24 (5th Cir. 2014); *see United States v. Zavala*, 541 F.3d 562, 580 (5th Cir. 2008) ("[W]e have never held that a police officer may detain a defendant for one hour and thirty minutes until a full-blown drug investigation is completed."). "An arrest occurs when, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Massi*, 761 F.3d at 522 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). A warrantless arrest must be supported by probable cause, *id.*, which the officers did not have.

**B. Ms. Aguilar's statements must be suppressed as a fruit of the illegal seizure and also as involuntary statements.**

Ms. Aguilar's statements and their fruits must be suppressed because they are not sufficiently attenuated to be free of the taint from the Fourth Amendment violation. *See Wong Sun*, 371 U.S. at 488. Her statements were not "an act of free will [sufficient] to purge the primary taint of the unlawful invasion." *Id.* at 486.

When challenged custodial statements are the "fruit" of an unlawful seizure, the relevant factors to determine admissibility are: "(1) the provision of *Miranda* warnings; (2) the temporal proximity between the unlawful arrest and the challenged statements; (3) intervening circumstances; and (4) the purpose and flagrancy of the official misconduct." *United States v. Mendez*, 885 F.3d 899, 909 (5th Cir. 2018) (citing *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (per

curiam)). The burden rests with the Government. *Brown v. Illinois*, 422 U.S. 590, 604 (1975). The Government cannot sustain its burden here.

**1. No *Miranda* warnings.** The officers did not provide Ms. Aguilar *Miranda* warnings until after three hours of questioning. Instead, they encouraged her to tell them about the alleged crime in order to help herself—without ever informing her that what she said could be used against her in court or that she had a right to consult with an attorney. This factor weighs against attenuation.

**2. Statements were close in time to the illegal arrest.** Ms. Aguilar was pulled over. Within a few minutes, officers had exerted their authority over her and confiscated her cell phone. She was immediately transported to the station house for interrogation. She was taken to the interrogation room at 8:30 p.m., and the interrogation began 10 minutes later. This short temporal duration, while she was continually in the officers' custody, weighs against attenuation. *See United States v. Mendez*, 885 F.3d 899, 911 (5th Cir. 2018).

**3. No intervening circumstances.** From moments after her initial detention through the interrogation, Ms. Aguilar did not have control of her cell phone—her main mode of contact with the outside world. After pulling her over, the officers told her she could leave and that she did not have to talk to them, but these statements were contradicted by the police-dominated atmosphere at the stop. The officers took her phone and demonstrated that they were watching her and could pull her over at any time. After the detention, she was in the constant presence and supervision of at least two armed officers. At the station, more of her belongings were taken away and she was taken out of the public view to a small, windowless interrogation room. She was told that she was not under arrest and did not have to talk to the officers, but she was not told at the stationhouse that she was free to leave. This factor weighs against attenuation.

**4. The flagrancy of the misconduct.** The officers' misconduct here was flagrant. It was the officers' purpose to stop her and question her. They did so without lawful justification and the incriminating evidence flowed directly from this purposeful misconduct. All factors weigh in favor of suppressing her statements. Even if the Court finds the misconduct was not flagrant, this does not attenuate the taint of the illegality. *See Taylor v. Alabama*, 457 U.S. 687, 693 (1982) (rejecting State's argument that the lack of flagrant misconduct counseled rendered the statement attenuated).

These factors demonstrate that Ms. Aguilar's statements during the interrogation were not attenuated from the unlawful seizure and must be suppressed as tainted fruits.

### C. Additionally, Ms. Aguilar's statements during custodial interrogation must be suppressed because she was not provided her *Miranda* warnings.

The Fifth Amendment of the U.S. Constitution provides that "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect this right against self-incrimination during the "inherently compelling pressures" of custodial interrogation, the Supreme Court adopted a set of prophylactic measures in *Miranda v. Arizona*, 384 U.S. 436 (1966). *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010). *Miranda* announced that officers "must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney." *Id.* Without *Miranda* warnings, the psychological pressures of "incommunicado interrogation in an unfamiliar, police-dominated atmosphere" would "undermine the individual's will to resist and … compel him to speak where he would not otherwise do so freely." *Id.* (internal quotation marks omitted). Such interrogation "carries its own badge of intimidation" and is meant "to subjugate the individual to the will of his examiner." *Miranda*, 384 U.S. at 457. Because this "is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself," *id.* at 458, the Supreme Court requires *Miranda* warnings to counterbalance these pressures. *Id.* at 471-72.

"A suspect is in custody for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (cleaned up). To make that determination, a court must decide, "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *Id.* (cleaned up). The subjective view of the interrogating agent or the suspect is irrelevant. *Id.*

Determining *Miranda* custody depends on the totality of the circumstances. *Id.* However, the Court repeatedly considers certain key factors, including:

   (1) the length of the questioning;
   (2) the location of the questioning;
   (3) the accusatory, or non-accusatory, nature of the questioning;
   (4) the amount of restraint on the individual's physical movement;
   (5) statements made by officers regarding the individual's freedom to move or leave.

*United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015) (internal citations omitted). Even if a suspect is not in custody at the beginning of an interrogation, the circumstances can develop into custody if a reasonable person would have felt unable to terminate the interrogation and leave. *See United States v. Jayyousi*, 657 F.3d 1085, 1110 (11th Cir. 2011) (finding interrogation became custodial after the agent accused the suspect of terrorist activities); *United States v. Rith*, 954 F. Supp. 1511, 1517 (D. Utah 1997) (finding interrogation became custodial after suspect was confronted with the illegal weapon).

Here, the totality of the circumstances indicate that Ms. Aguilar was in *Miranda* custody at the beginning of the interrogation.[2] At least two officers took her to the military police station for questioning. They had taken her phone shortly after the initial seizure, and they took the rest of her property before placing her in a windowless interrogation room.

Once Trooper Dendy entered, he closed the door. Ms. Aguilar was cut off from the public—incommunicado. At first, Dendy told Ms. Aguilar she was not under arrest and that she did not have to answer his questions. He did not tell her that she was free to leave. The totality of circumstances show Ms. Aguilar was in custody given how she came to be at the station (detained after a traffic stop), the amount of time she was questioned (a total of 4.5 hours), the location (a closed-off interrogation room in a police station), the accusatory nature of questioning (accusing her of lying to a federal agent and escalating to accusing her of accessory to murder), and her inability to leave (since officers had possession of her belongings).

Trooper Dendy told Ms. Aguilar that this interrogation would be different because he knew that she had lied to him. Ms. Aguilar already knew that lying to an officer was a crime. After she explained that Robinson and she had left the house on April 22 to go for a drive as a mental-health coping mechanism, Dendy again told her that he knew she was lying because they found a body in the area where Robinson and she had been that night. This communication of evidence and suspicion would have made a reasonable person believe she was not free to leave. *See Stansbury v. California*, 511 U.S. 318, 324–25 (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."); *compare*

---

[2] The officers were clearly interrogating Ms. Aguilar. "Interrogation" under *Miranda* refers to words or actions on the part of law enforcement agents that the agents "should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

with *United States v. Bengivenga*, 845 F.2d 593, 600 (5th Cir. 1988) (finding no custody in part because "agents did not communicate the basis for their suspicions").

### D. Ms. Aguilar's post-warning statements must be suppressed because the officers deliberately engaged in a two-step strategy; additionally, the *Miranda* waiver was not voluntary.

Three hours after Ms. Aguilar entered the interrogation room, after she provided unwarned incriminating statements, Trooper Dendy told Ms. Aguilar that she was under arrest and advised her of her *Miranda* rights. DVD 3:04. Ms. Aguilar continued to make controlled calls with Robinson, and described his explanation of why he killed V.G. The officers' interrogation, which lacked any curative instructions or break in time or location, violates *Miranda*. *See Missouri v. Seibert*, 542 U.S. 600, 618-22 (2004) (Kennedy, J., concurring).

In *Seibert*, the Supreme Court addressed a custodial interrogation practice of not advising a suspect of her *Miranda* rights until she confesses, and then giving the warning and covering the same ground with the suspect again to try to make the statement admissible. 542 U.S. at 604. Justice Kennedy's concurrence produced the holding: a post-warning statement must be suppressed "where a deliberate two-step strategy is used and no curative measures are taken[.]"[3] *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006).

The officers' two-step strategy here was deliberate. Courts "review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness[.]" *United States v. Capers*, 627 F.3d 470, 478-79 (2d Cir. 2010) (describing the Fifth Circuit's test in *United States v. Nunez-Sanchez*, 478 F.3d 663, 668–69 (5th Cir. 2007), and

---

[3] Ms. Aguilar raises to preserve for further review the argument that the multi-factored test outlined by the *Seibert* plurality, not Justice Kennedy's test, is the correct one. *See Seibert*, 542 U.S. at 615. Under that test, Ms. Aguilar's post-warning statements would be excluded because the questions and answers overlapped with the pre-warning statements and occurred immediately after the pre-warning statements, in the same setting, and in response to questioning by the same agents. *See id.*

adopting it); *see Seibert*, 542 U.S. at 616 n. 6 (recognizing that "the intent of the officer will rarely be as candidly admitted as it was here" where officer admitted to intentionally using the strategy). That evidence includes "'the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements.'" *United States v. Street*, 472 F.3d 1298, 1314 (11th Cir. 2006) (quoting *United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006)); *see United States v. Moore*, 670 F.3d 222, 230 (2d Cir. 2012) (explaining the court uses the *Seibert* "plurality's five factors not to weigh the effectiveness of the later *Miranda* warnings, but to shed light on the detectives' intent"); *see also United States v. Ashmore*, 609 F. App'x 306, 318 (6th Cir. 2015) (applying totality of circumstances test).

Here, the totality of the circumstances indicates that the officers deliberately detained Ms. Aguilar and questioned her incommunicado in a stationhouse interrogation room for three hours—without advising her of her *Miranda* rights. This interrogation followed a months-long investigation that revealed Ms. Aguilar had lied to officers and that human remains were found in the same location where Ms. Aguilar and Robinson had been according to cellular data. The officers confronted Ms. Aguilar with her lies and the discovering of the body, and then encouraged her to tell them what happened to help herself—without ever explaining those statements could be used against her or that she had the right to an attorney. The two-step strategy was deliberate.

And the officers employed no curative measures. Justice Kennedy explained, "Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). These would include "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning" to allow "the accused

to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id*. Here, there was no break in time or change in location. And Trooper Dendy did not explain that the pre-warning statements could not be used against Ms. Aguilar.

This "two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). Trooper Dendy only *Mirandized* Ms. Aguilar after the officers got incriminating statements. Nothing else changed to necessitate *Miranda*. The custodial circumstances remained the same, and the agents had largely finished their interrogation—except they still wanted Ms. Aguilar's help apprehending Robinson, recovering evidence of the alleged crime, and explaining Robinson's actions.

Even if the Court determines the officers did not use the prohibited two-step interrogation strategy, Ms. Aguilar's post-warning statements are inadmissible under *Oregon v. Elstad*, 470 U.S. 298 (1985). "Under *Elstad*, the relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Courtney*, 463 F.3d at 338 (cleaned up). The Government bears the burden to prove the post-warning statement was voluntary. *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). The statement is involuntary "if the tactics employed by law enforcement officials constitute a Fifth Amendment due process violation and are so offensive to a civilized system of justice that they must be condemned." *United States v. Lim*, 897 F.3d 673, 692 (5th Cir. 2018) (cleaned up).

That is the case here. By the time Trooper Dendy advised her of her *Miranda* rights, Ms. Aguilar already felt trapped. She had made incriminating statements and had been attempting to help officers apprehend her boyfriend for the past three hours. She broke down and sobbed multiple times during the interrogation. When Dendy told Ms. Aguilar she was going to be arrested that night, her response was, "I thought that's why I was doing all this"—referring to her cooperation

throughout the evening, incredulous that she was still going to jail. DVD 3:03:30. Any *Miranda* and her post-warning statements were involuntary, and the subsequent statements must be suppressed.

### III.     CONCLUSION

Ms. Aguilar requests an evidentiary hearing on this Motion to resolve factual issues. In connection with the requested evidentiary hearing, Ms. Aguilar requests, pursuant to Rule 26.2 of the Federal Rules of Criminal Procedure, that the Government disclose to defense counsel at least forty-eight hours prior to the hearing any statements, including grand jury testimony, of suppression hearing witnesses. Ms. Aguilar further requests that the Government disclose any *Brady* or *Giglio* materials or materials relevant to her defense within this time frame. *See* Fed. R. Crim. P. 16(a)(1)(E). This request includes any video or audio recording of the earlier interview on June 30, 2020, and of the stop of the Dodge Caravan and interaction with Ms. Aguilar leading up to the interrogation in the USACID Office. This request is made in order to avoid delays in conducting the hearing. Ms. Aguilar expressly requests the right to raise any other motions based on the facts and evidence that may arise during any evidentiary hearings in this case, and the right to file a supplemental brief more fully addressing the testimony given at the hearing and the applicable law.

WHEREFORE, Ms. Aguilar prays that the Court set this motion for an evidentiary hearing and that the Court order that the fruits of the illegal seizure and the unwarned statements obtained from Ms. Aguilar be suppressed. Ms. Aguilar further requests advance discovery as set forth above and that the Court grant her leave to file such further briefing of the issues herein as may appear necessary after said hearing.

Maureen Scott Franco
Federal Public Defender


/S/
LEWIS B. GAINOR
Supervisory Assistant Federal Public Defender
Western District of Texas
800 Franklin Ave, Suite 380
Waco, Texas 76701
(915) 352-2940
Ill. Bar No. 6281785
*Attorney for Defendant*

## CERTIFICATE OF SERVICE

      I hereby certify that on the 24th day of March, 2021, I electronically filed the foregoing with the Clerk of Courts using the CM/ECF system which will send notification of such filing to the following:

Mark Frazier, Assistant United States Attorney
Gregory S. Gloff, Assistant United States Attorney

                                              /S/
                                    LEWIS B. GAINOR
                                    *Attorney for Defendant*

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

WACO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § § § |
| V. | § § NO. W-20-CR-097-ADA |
| CECILY AGUILAR | § § § § |

**ORDER GRANTING MOTION TO SUPPRESS**

On this day, the Court considered Defendant's Motion to Suppress (ECF No. ___) filed in the above-captioned cause. After considering the Motion, this Court is of the opinion that the Motion should be GRANTED.

IT IS THEREFORE ORDERED that the statements made by Defendant on June 30, 2020, in the interrogation room of the USACID Office and thereafter are hereby SUPPRESSED and inadmissible at trial.

IT IS FURTHER ORDERED that any other fruits of the illegal seizure of Defendant on June 30, 2020, or of her statements are hereby SUPPRESSED and inadmissible at trial.

SIGNED this ___ day of _____, 2021.

_____
HON. ALAN D. ALBRIGHT
UNITED STATES DISTRICT JUDGE